## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY (VICINAGE OF NEWARK)

Kenneth Rosellini, Esq. (6047)
Hallock & Cammarota, LLP
600 Valley Road, Suite 101
Wayne, New Jersey 07470
(973) 692-0001
*Attorneys for Plaintiffs, Christopher H. Knierim and Jack Zaccaria*

| | |
|---|---|
| Christopher H. Knierim and Jack P. Zaccaria, <br><br> Plaintiffs, <br><br> v. <br><br> Siemens Building Corporation, The Attwater Blue Corporation, Ben Raue, Jeff Hooper, Gina Alladin and Michael Bolinger. <br><br><br> Defendants. | Docket No.: $O6$-$4935$ (JCL) <br><br><br> <u>CIVIL ACTION</u> <br><br> **COMPLAINT** |

The Plaintiffs, Christopher H. Knierim and Jack P Zaccaria (hereinafter referred to at times as "Knierim" and "Zaccaria" respectively, or together as "Plaintiffs") by way of complaint against the Defendants, Siemens Building Corporation (hereinafter referred to at times as "Siemens"), The Attwater Blue Corporation (hereinafter referred to at times as "Attwater"), Ben Raue ("Raue"), Jeff Hooper ("Hooper"), Gina Alladin ("Alladin") and Michael Bolinger ("Bolinger") says:

**JURISDICTION**

1.    In accordance with U.S.C.A. §1332, there is diversity of citizenship as the amount of

the matter in controversy exceeds the sum or value of $75,000, exclusive of interest

and costs, and is between citizens of different States.

**PARTIES**

2.    Plaintiff, Christopher H. Knierim, is a citizen of the State of New Jersey, residing in

Wayne, New Jersey.

3.    Plaintiff, Jack P. Zaccaria, is a citizen of the State of New Jersey, residing in Howell,

New Jersey.

4.    Upon information and belief, Defendant, Siemens Building Corporation is an Illinois

Corporation with headquarters in Buffalo Grove, Illinois and doing business in the

State of New Jersey.

5.    Upon information and belief, Defendant, The Attwater Blue Corporation is an Illinois

Corporation with headquarters in Schaumburg, Illinois and doing business in the State

of New Jersey.

6.    Upon information and belief, Defendant, Ben Raue, is President of Attwater and a

citizen of the State of Illinois, residing in Chicago, Illinois.

7.    Upon information and belief, Defendant, Jeff Hooper, is Vice-President of Attwater

and a citizen of the State of Illinois, residing in Chicago, Illinois.

8.    Upon information and belief, Defendant, Gina Alladin, is a Senior Manager of

Siemens in their human resources department, residing in Raleigh, North Carolina.

9.    Upon information and belief, Defendant, Michael Bolinger, is a Staffing Account

Manager of Siemens in their human resources department, residing in Indianapolis,

Indiana.

## FACTS

10.    In or about December of 2004, Attwater was incorporated by Ben Raue and Jeff
       Hooper for the purpose of creating a recruitment sourcing center to handle exclusively
       Siemens' Siemens Building Technologies ("SBT") division.

11.    Ben Raue and Jeff Hooper were both former contract recruiters on site in the SBT
       Buffalo Grove Headquarters of Siemens in the Human Resources Department of SBT
       Division through 2004.

12.    The SBT Division specializes in the HVAC, fire, building automation, energy and
       security industries.  Siemens manufactures, sells, distributes and installs products in
       these areas through their nationwide branch locations for Siemens' customers.

13.    These branch locations maintain a full time staff in order to meet the level of
       personnel required to satisfy the needs of Siemens' customers.

14.    In or about December of 2004, Attwater won a public bid one year contract from
       Siemens to provide staffing services for Siemens' Subsidiaries and/or Divisions for
       positions including, but not limited to: Sales, Operations, Service, Engineering,
       Marketing, Accounting, Finance, Procurement, Quality Assurance etc. for all branch
       locations and corporate headquarters for approximately 45 job requisitions per month,
       at approximately $3,000 per requisition.

15.    The committee of decision-makers at Siemens whom determined which vendor would
       receive the public bid included Gina Alladin, who is a Senior Human Resource
       Manager for Siemens.

16.    Alladin's responsibilities included direct management of the Attwater Vendor
       Contract and the Siemens primary contact person on the contract.

17.    Upon information and belief, Attwater's contract with Siemens is the sole source of
       revenue for Attwater.

18.    Upon information and belief, in order to service their contract with Siemens, Attwater decided to hire approximately six full cycle recruiters, and one name generation specialist to work with those six full cycle recruiters.

19.    In or about December of 2004, Zaccaria had approximately 17 years experience as a full cycle recruiter.

20.    This experience included a longstanding relationship with Siemens, including work with Gina Alladin.

21.    In or about December of 2004, Knierim was working for Quintegra (a company located out of Indianapolis, Indiana whom also bid on the Siemens' contract and had done work with Siemens) and had approximately 4 years experience as a name generation specialist, providing staffing for various positions in the HVAC, fire, security and building automation industry.

22.    This experience included work with Siemens, including work with Gina Alladin.

23.    In or about December of 2004, Ben Raue approached Zaccaria for the purpose of recruiting him as a full cycle recruiter for Attwater and with intention that he would become the director of Attwater's general operations within a relatively short time period.

24.    Zaccaria then informed Attwater that he had worked with Knierim, and recommended that Attwater hire Knierim as a name generation specialist.

25.    In or about December of 2004, Attwater hired Knierim as a name generation specialist and Zaccaria as a full cycle recruiter.

26.    Attwater hired Zaccaria as an independent contractor for an hourly rate of $70 with guaranteed 45 hours per week.

27.    Attwater hired Knierim as independent contractor at an hourly rate of $35 with a minimum of forty hours per week.

4

28.  In or about January of 2005, Michael Bolinger, was hired as a Human Resources Staffing Consultant at Siemens from Quintegra, the same company that Knierim was a contract recruiter for prior to Attwater. Later that year, Bolinger began to assume responsibility for the Attwater Contract along side Alladin.

29.  In or about December of 2005, Siemens informed Attwater that they would continue the contract under the publicly bid terms and conditions for another six months, and then put out the contract for public bid again in approximately July of 2006.

30.  In the middle of December of 2005, Hooper makes several negative comments to employees of Attwater and to Alladin and Bolinger, and then e-mails Raue and Knierim saying that Knierim and his "name generation lists are fucking waste of time and useless."

31.  On November 3, 2005, Attwater offered that Zaccaria become a partner in Attwater and assume the new role of Director of Recruiting. In this role, Zaccaria would assume the title of Director of Recruiting effective November 7, 2005, and would provide overall leadership in managing the SBT Sourcing Center.

32.  However, on November 7, 2005 Attwater and Zaccaria were unable to mutually agree to the terms and conditions under which he would serve as Director of Recruiting. Hooper and Raue decided that Hooper would take on the role of Director of Recruiting instead.

33.  Attwater continued to rely on and give Zaccaria the responsibility to handle the most difficult, comprehensive, high management level positions on an on going basis. In addition, on many occasions Zaccaria was requested by Siemens, including Alladin and Bolinger, to work on these most difficult positions and to directly interface with Senior Executives. This interfacing was something that no other Attwater employee or independent contractor was authorized to do.

34. As a result of the failed negotiations, Attwater terminated Zaccaria's independent contract in or about January 2006 and provided him thirty days notice.

35. Attwater, however, alleged to employees and independent contractors at Attwater, and to Siemens, that the termination was a result of Zaccaria's poor performance and not the fact that it was a result of failed negotiations.

36. Attwater asked Zaccaria to continue to work during the 30 day notice period and Zaccaria agreed. A few days later, word spread to the Siemens' recruiters that Zaccaria was being terminated.

37. Siemens' Recruiters then complained to Alladin and Bolinger, their supervisors for the contract, as well as complained to their immediate supervisors, because they needed work done on job requisitions that Zaccaria had been handling, and Zaccaria would be unable to finish them before the 30 day notice period would be completed.

38. Due to Zaccaria's termination, some Siemens human resource employees began to express to Zaccaria their frustration over Attwater's decision and as a result this was communicated up the ranks to Alladin and Bolinger since they were responsible for the Attwater Vendor Contract.

39. Alladin and Bolinger quickly alerted Attwater to inform them that the Siemen's recruiters were complaining about the decision to terminate Zaccaria, and started to inquire further to gain more specifics as to why Zaccaria was really terminated.

40. Within an hour or so of one of Siemens' recruiter's complaints to Alladin, Zaccaria's passwords and all other communication with Siemens were abruptly halted and Hooper sent an e-mail to Zaccaria informing him that his termination was effective immediately. Hooper and Raue then further advised Zaccaria, by telephone, to have no contact with Siemens' employees, and that Attwater would pay Zaccaria for the remaining 30 days.

41.  Knierim continued to work for Attwater under terms and conditions of the original agreement, and in or about February of 2006, Knierim entered into a new agreement as in independent contractor under the previous terms but for the rate of $6,500 per month.

42.  Unable to compensate for the loss of Zaccaria's expertise and with Hooper failing to meet the demands of the Director position, in or about May of 2006 Raue contacted and re-recruited Zaccaria for the purpose of hiring him as an independent contractor in the position of full cycle recruiter.

43.  The reason that Attwater reached out to Zaccaria was because Raue and Dillon had determined that Hooper did not have the experience, people skills or management ability for the Director position, in fact Hooper requested and was seeking a different role for himself within Attwater.

44.  In addition, Attwater needed someone to work along side Mark Dillon as an energy expert, because Dillon was spearheading a new pilot program for Siemens in the energy sector and Zaccaria was more qualified than any of Attwater's then current or former independent contractors or employees.

45.  In or about May of 2006, by way of oral agreement, Attwater rehired Zaccaria as an independent contractor at the monthly rate of $4,000 per month.

46.  In or about June of 2006, Attwater increased Zaccaria's monthly rate to $8,000 per month.

47.  In or about April of 2006, Siemens had put out its SBT Division Contract for public bid in much the same manner as it had done in 2004.

48.  In or about June 2006 Attwater is outbid by a company called The Right Thing, Inc., located in Findlay, OH and having 180 employees compared with Attwater's 10 employees/independent contractors.

49.   Attwater bid approximately $2,700 per job, and The Right Thing bid approximately $900 per job.

50.   SBT Division decides that it will give all the jobs to The Right Thing at the approximate $900 rate, and that, at The Right Thing's own discretion, Attwater would be utilized as the Associate Vendor at a higher rate.

51.   Therefore, The Right Thing becomes the master vendor and Attwater an associate vendor. As the master vendor, one of The Right Things responsibilities is to determine how many requisitions Attwater will receive on a monthly basis and to also pay Attwater directly for any services rendered.

52.   In other words, upon receiving the job requisition requests from Siemens, The Right Thing would have the opportunity to review those requests and determine which ones would be handled by Attwater.

53.   Attwater would then invoice The Right Thing for services performed and The Right Thing would pay Attwater directly for those invoices out of monies received from Siemens.

54.   On or about June 23, 2006, Knierim is flown out to Attwater's office in Illinois at Hooper and Raue's request. Bolinger speaks at the Attwater office and says "he and Gina will take care of Attwater in going forward so don't worry"

55.   On or about June 24, 2006, Bolinger is then invited by Attwater to go for dinner, drinks and dancing. The next day Hooper invites everyone to his home for a barbeque, where he shows his wine cellar and his special collection of numerous expensive, empty bottles of wine, which he had previously drank in his wine cellar with Alladin and Bolinger from the many previous occasions they were there. All of these bottles were signed personally by Alladin and Bolinger and in a special showcase.

56. At the wine cellar, Hooper took Knierim aside and informed him that Attwater was in negotiations with Alladin for her to become president of Attwater.

57. The Right Thing, Inc. and Attwater both enter into a six month agreement with Siemens to service the recruiting needs of the SBT Division at the aforementioned rates and percentage of business.

58. Subsequent to being awarded the contract in or about July of 2006, The Right Thing began to service the SBT Division.

59. In or about late July or August, Hooper advises Knierim that Attwater is not getting the amount of work they were told originally and as a result he may have to layoff some people. Hooper was distraught and, in a matter of days, he makes an announcement that no one is to worry and says "our good friends, and the possible future President of Attwater, Alladin, along with Bolinger, have agreed to make sure Attwater receives a minimum of 35 requisitions per month."

60. Hooper said that Attwater did not have this guarantee in writing, but he goes on to say there is no need to worry because it has been promised to us by our two good friends Alladin and Bolinger. Hooper is relieved and gloats that they are not only being guaranteed requisitions, but that they are receiving more money per requisition than The Right Thing.

61. Dillon called Knierim later that night to assure him that Attwater would continue to have business with Siemens and that Knierim's job was secure based on Alladin's assurances.

62. In or about August of 2006, because, *inter alia*, Attwater had failed to come to terms with Zaccaria on a written contract; (around this time) Hooper was making announcements to Attwater employees and independent contractors that Attwater was continuing to have financial difficulties because of the drop in business as a result of The Right Thing; Zaccaraia was seeking a stable long term opportunity; and because

9

he heard that The Right Thing might need assistance, Zaccaria contacted the President

of The Right Thing, Terry Turhark to inquire about a recruiting position.

63.    Turhark then referred Zaccaria to Michael Gruber, Vice-President of The Right Thing,

and chief person in charge of the Siemens contract.

64.    On his own volition, Knierim then contacted Turhark providing himself as a good

reference for Zaccaria and also forwarded a resume of himself in order to secure a

stable long term opportunity.

65.    On or about August 21, 2006, a phone interview took place with Gruber, upon which

Gruber informed Zaccaria that he was impressed with his qualifications and referred

him to Turhark for a further phone interview.

66.    On or about August 25, 2006, Turhark then conducted an approximately forty minute

phone interview with Zaccaria and informed Zaccaria that the interview went well,

that he was impressed with his qualifications, very interested in further conversations

and wanted to quickly schedule a face to face interview.

67.    On or about September 7, 2006, Gruber called Alladin and in that conversation

disclosed that Zaccaria was interviewing and that they were very interested in him.

68.    On or about September 7, 2006, Alladin and/or Bolinger alerted Attwater that

Zaccaria was interviewing with The Right Thing and that they were very interested in

him.

69.    In the early evening of September 7, 2006, that same day, and subsequent to Alladin

and/or Bollinger alerting Attwater, Hooper contacts Zaccaria, leaving an irate voice

mail message informing him that Zaccaria was terminated effective immediately and

no longer part of the team, without providing any reason for the termination.

70.    Later that evening, Zaccaria was contacted by Mark Dillon, a partner in Attwater,

whom informed Zaccaria that he was sorry to hear of his termination because his

performance was very good and he did everything he was requested to do.

10

71.    Dillon then said that this was a major blow to the energy pilot and he was very
concerned that Attwater will not be able to produce effective results for Siemens
without Zaccaria, since he was the only one left who was qualified to work on energy
requisitions.

72.    Dillon then explained to Zaccaria that Hooper had been contacted by Gina Alladin
earlier in the day, who informed Attwater that Zaccaria was seeking employment with
The Right Thing, and that Hooper decided to terminate him as a result.

73.    After he was terminated by Attwater, Zaccaria tried to contact The Right Thing to
inquire about his phone interview, but never received any reply.

74.    On September 8, 2006, Zaccaria provided Attwater his final invoice for services
rendered in the amount of $11,450 for July, August and September of 2006.  Attwater
has acknowledged that this amount is due and owing, but has failed and refused to pay
said amount.

75.    On September 8, 2006 Terhark's secretary informed Knierim that The Right Thing
wanted to set up an interview with him for a position as a name generation specialist.

76.    The secretary informed Knierim that Turhark would be in Mt. Laurel at the Radison
Hotel and that the interview would take place over dinner on Thursday, September 14
at 6:00 P.M., and Knierim agreed.

77.    On or about September 9, 2006, Knierim informs Turhark via email that he is
concerned about confidentiality with interviewing because of the events that happened
with Zaccaria.  Terhark replies that everything will be kept in the strictest confidence.

78.    Subsequently on the morning of September 11, 2006 Gruber contacted Gina Alladin
for a reference, and Alladin gave Zaccaria a positive one.  Gruber contacts Zaccaria
and says that both he and Terhark would like to discuss the next steps in the interview
process and are very interested.  Gruber also states that Terhark is going to call

Hooper out of just being "courteous" from one vendor to another in order to let him know The Right Thing is pursuing Zaccaria further.

79.     On or about September 12, 2006, Terhark calls Hooper. It is later disclosed to Knierim by Terhark during the face to face interview with Terhark and Knierim on September 14, 2006, that Hooper bashed Zaccaria's reputation and advised Terhark to not pursue him further.

80.     On September 12 and 13 Gruber continues to be in discussions with Zaccaria and begins to get specific on the different ways The Right Thing could engage his services.

81.     September 13, 2006 is the last day of communication between The Right Thing and Zaccaria.  Zaccaria no longer hears from The Right Thing and none of his calls are returned from there forward.

82.     On Wednesday, September 13, 2006, Knierim received a call from Hooper and Raue, together, who both interrogate him and give accusations that they knew that he was going on an interview with Terhark and that they knew all the details of the time and location from Bolinger and Alladin.

83.     Hooper told Knierim that he has a legal obligation under their contract to inform them when there is any contact by a competitive company to Attwater's employees or independent contractors—including any contact from The Right Thing.

84.     However, there is no non-compete clause in any contract by and between Knierim and Attwater.

85.     During the telephone call, Hooper and Raue indicated they were considering terminating Knierim.

86.     Latter that evening Turhark left a voice mail with Knierim saying that Hooper was alerted by Siemens and knows about the scheduled interview, and in turn, called Terhark to try to find out more detail.

12

87.  The scheduled interview took place as scheduled, but was very brief – 15 minutes.

88.  Turhark, however, tells Knierim that Alladin and Bollinger gave negative information about Zaccaria to The Right Thing after the initial good reference, and on the day prior to the interview, gave The Right Thing a bad reference on Knierim for the purpose of squashing any potential possibility that he had to work for The Right Thing.

89.  Turhark said that "Gina really bashed Zaccaria." Terhark tells Knierim that he feels there is something "funny" going on with Alladin and Attwater.

90.  Turhark informed Knierim that The Right Thing still was considering hiring him and would give an answer on Friday, September 15, 2006.

91.  On Saturday, September 16, 2006, Knierim received an e-mail from Turhark asking him if he had a non-compete clause with Attwater, and Knierim responded that he did not.

92.  Turhark then e-mailed Knierim that he would have an answer on Monday, but no answer was ever given.

93.  Knierim has not heard back from The Right Thing since.

94.  In meantime, Knierim continued to work for Attwater on the September open requisition list.

95.  On or about September 21, 2006, Hooper informs Knierim via e-mail that Attwater had made a final decision regarding his employment and that he is terminated and not to communicate further with any member of Attwater.

96.  As a result of the termination via the e-mail of September 21, 2006, Knierim sent a final invoice for services rendered to Attwater through September 21, 2006 for the amount of $16,704.86 (including the 30 day buyout provision as per the written contract by and between Knierim and Attwater).

97.    Attwater has failed and refused to pay any part of Knierim's invoice, including the amount due and owing for services rendered in August which Attwater has acknowledged is due and owing.

98.    On October 6, 2006, Kneirim called Attwater to inquire as to the payment of the outstanding invoice, and was advised by Hooper that no payment would be forthcoming, not to bother to contact Siemens for employment or a reference, that he was going to speak to Tanya (an Attwater employee and a former Quintegra employee) and she'll ensure that Knierim can't be employed by Quintegra.

99.    Hooper has gloated to employees and/or independent contractors of Attwater and to Siemens' employees that his bashing of Plaintiffs' reputation and his threats to Turhark mean that Knierim and Zaccaria are now a couple of "train wrecks".

### First Cause of Action—Slander

100.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 - 99 of the Complaint herein and incorporates the same by reference as if fully set forth herein.

101.   Statements set forth above which were made by the Defendants, Gina Alladin and Michael Bolinger, both individually and in their capacity as agents for Siemens Building Corporation and by the Defendants, Ben Raue and Jeff Hooper, both individually and in their capacity as agents for The Attwater Blue Corporation, were false and defamatory concerning the Plaintiffs.

102.   Said statements were unprivileged publications to third parties.

103.   Said statements were either made and published intentionally or with negligence by the Defendants.

104.   Said statements have caused the Plaintiffs damage in that, *inter alia*, their professional reputation and ability to make a living in their chosen fields has been irreparably harmed.

**WHEREFORE** the Plaintiff, Christopher H. Knierim, demands judgment against the Defendants, Siemens Building Corporation, The Attwater Blue Corporation, Ben Raue, Jeff Hooper, Gina Alladin and Michael Bolinger, jointly and severally, for:

a)   $796,740.86; and

b)   Compensatory Damages to be determined; and

c)   $1,000,000.00 in Punitive Damages

d)   Interest; and

e)   and Attorneys Fees.

**WHEREFORE** the Plaintiff, Jack P. Zaccaria, demands judgment against the Defendants, Siemens Building Corporation, The Attwater Blue Corporation, Ben Raue, Jeff Hooper, Gina Alladin and Michael Bolinger, jointly and severally, for:

a)   $971,740.86; and

b)   Compensatory Damages to be determined; and

c)   $1,000,000.00 in Punitive Damages

d)   Interest; and

e)   and Attorneys Fees.

**Second Cause of Action—Breach of Contract**

105.  Plaintiffs repeats and re-allege each and every allegation contained in Paragraphs 1 - 104 of the Complaint herein and incorporates the same by reference as if fully set forth herein.

106.  Attwater offered to pay Zacarria $8,000 per month to perform the services of a full cycle recruiter.

107.  Zacarria accepted and did perform those services in an exemplary and workmanlike manner.

108.  The amount of $11,450 is due and owing from Attwater to Zacarria for services performed.

109.  Zaccarria has provided Attwater with an invoice for this amount and Attwater has failed and refused to pay said invoice.

110.  Attwater offered to pay Knierim $6,500 per month to perform the services of a name generation specialist.

111.  Knierim accepted and did perform those services in an exemplary and workmanlike manner.

112.  Knierim was terminated by Attwater without proper notice in accordance with their contract.

113.  Knierim's contract with Attwater calls for the losing party in a contract dispute to pay the winning party all attorneys fees and costs.

114.  The amount of $16,740.86 is due and owing from Attwater to Knierim for services performed and for the buyout of his contract.

115.  Knierim has provided Attwater with an invoice for this amount and Attwater has failed and refused to pay said invoice.

**WHEREFORE** the Plaintiff, Christopher H. Knierim, demands judgment against the The Attwater Blue Corporation, Ben Raue, Jeff Hooper, jointly and severally, for:

a)    $16,740.86; and

b)    Compensatory Damages to be determined; and

d)    Interest; and

e)    and Attorneys Fees.

**WHEREFORE** the Plaintiff, Jack P. Zaccaria, demands judgment against the Defendants, Siemens Building Corporation, The Attwater Blue Corporation, Ben Raue, Jeff Hooper, Gina Alladin and Michael Bolinger, jointly and severally, for:

a)    $11,450; and

b)    Compensatory Damages to be determined; and

d)    Interest; and

e)    and Attorneys Fees.

### Third Cause of Action—Breach of Implied Covenant of Good Faith and Fair Dealing

116.    Plaintiffs repeats and re-alleges each and every allegation contained in Paragraphs 1 - 115 of the Complaint herein and incorporates the same by reference as if fully set forth herein..

117.    Attwater, by their agents servants and/or employees entered into a contract with Plaintiffs upon their hire and upon the term of employment.

118.    The basic terms of which were that Plaintiffs' employ would be secure as long as their performance was satisfactory.

119.    "The implied covenant of good faith and fair dealing is used to measure a party's performance under a contract." See *1266 Apartment Corp. v. New Horizon Deli Inc.,*

368 N.J. Super 456, 462 (A.D. 2004) [quoting *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244-52 (2001)].

120.  By causing Plaintiffs' termination and interfering with Plaintiffs' performance of their duties without probable cause and in bad faith, Attwater breached the covenant of good faith and fair dealing.

**WHEREFORE** the Plaintiff, Christopher H. Knierim, demands judgment against the Defendants, The Attwater Blue Corporation, Ben Raue and Jeff Hooper, jointly and severally, for:

a)      $796,740.86; and

b)      Compensatory Damages to be determined; and

c)      $1,000,000.00 in Punitive Damages

d)      Interest; and

e)      and Attorneys Fees.

**WHEREFORE** the Plaintiff, Jack P. Zaccaria, demands judgment against the Defendants, The Attwater Blue Corporation, Ben Raue and Jeff Hooper, jointly and severally, for:

a)      $971,740.86; and

b)      Compensatory Damages to be determined; and

c)      $1,000,000.00 in Punitive Damages

d)      Interest; and

e)      and Attorneys Fees.

18

**Fourth Cause of Action— Tortious Interference with Prospective Economic Advantage**

121.   Plaintiffs repeats and re-alleges each and every allegation contained in Paragraphs 1 - 120 of the Complaint herein and incorporates the same by reference as if fully set forth herein..

122.   Plaintiffs had a reasonable expectation of economic advantage in the positions that they accepted with Attwater.

123.   Plaintiffs had reasonable expectation of economic advantage in that The Right Things expressed an interest. in their services and would have employed their services if not but for the wrongful actions of Defendants as set forth above.

124.   Defendants intentionally, and with malice, divulged confidential information to third-parties and defamed the character of the Plaintiffs for their own benefit and to the detriment of the Plaintiffs.

125.   Said actions of Defendants have irreparably damaged the Plaintiffs prospective employment and professional careers.

126.   Defendants loss of employment caused by the Defendants actions have left them unable to obtain similar lucrative and stable positions, and they has suffered damage as a result.

**WHEREFORE** the Plaintiff, Christopher H. Knierim, demands judgment against the Defendants, Siemens Building Corporation, The Attwater Blue Corporation, Ben Raue, Jeff Hooper, Gina Alladin and Michael Bolinger, jointly and severally, for:

a)   $796,740.86; and

b)   Compensatory Damages to be determined; and

c)   $1,000,000.00 in Punitive Damages

d)   Interest; and

e)   and Attorneys Fees.

**WHEREFORE** the Plaintiff, Jack P. Zaccaria, demands judgment against the Defendants, Siemens Building Corporation, The Attwater Blue Corporation, Ben Raue, Jeff Hooper, Gina Alladin and Michael Bolinger, jointly and severally, for:

a)         $971,740.86; and

b)         Compensatory Damages to be determined; and

c)         $1,000,000.00 in Punitive Damages

d)         Interest; and

e)         and Attorneys Fees.

I hereby certify that to the best of my information, knowledge and belief that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, that no other action or arbitration is contemplated, and I am not aware of any other person whom should be joined in this matter.

Dated: October 13, 2006

KENNETH ROSELLINI, ESQ. (6047)

## TRIAL COUNSEL DESIGNATION

Kenneth Rosellini, Esq. is hereby designated trial counsel in this matter.

## JURY DEMAND

Plaintiff demands a jury of six (6) persons as to all issues

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Christopher H. Knierim and Jack P. Zaccaria

**(b)** County of Residence of First Listed Plaintiff    Passaic
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Hallock & Cammorota, LLP, 600 Valley Road, Wayne, NJ 973-692-0001

## DEFENDANTS

Siemens Building Corporation, The Attwater Building Corporation, et al

County of Residence of First Listed Defendant    Chicago, Illinois
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☒ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
Tortious Interference with Prospective Economic Advantage, Breach of Contract and Slander

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: --- ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                         DOCKET NUMBER

DATE
10/13/2006

SIGNATURE OF ATTORNEY OF RECORD
Kenneth Rosellini, Esq.

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG JUDGE_____

JS 44 Reverse  (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.    **(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

III.  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.   **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

V.    **Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

VI.   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
                                                 Brief Description: Unauthorized reception of cable service

VII.  **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.**  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

06-4935

LAW OFFICES

# HALLOCK & CAMMAROTA, LLP

600 VALLEY ROAD
WAYNE, NEW JERSEY 07470

JOSEPH A. HALLOCK ◊ *
PIETRO CAMMAROTA †
KENNETH ROSELLINI †
ANDREW SANGEORGE ∆
OF COUNSEL

(973) 692-0001
Fax (973) 692-0011
E-Mail Lawyers@HalCamLaw.com

◊ NEW JERSEY AND FLORIDA BARS
† NEW JERSEY AND NEW YORK BARS
∆ NEW JERSEY AND WASHINGTON, DC BARS
* FELLOW, AMERICAN COLLEGE OF TRUST
AND ESTATE COUNSEL

October 13, 2006

**VIA HAND DELIVERY**
US District Court,
District of New Jersey
Martin Luther King, Jr. Federal Building
50 Walnut Street
Newark, NJ 07102

Re:    **Knierim v. Siemens Building Corporation**
        **Filing of Complaint and Issuance of Summons**

Dear Sir/Madam:

Please be advised that this office represents the Plaintiffs Christopher H. Knierim and Jack P Zaccaria in the above-referenced matter.  Enclosed herewith for filing please find the following:

Original and Four Copies of Complaint
Original and Four Copies of Summonses for each of the Six Defendants
Original and Four Copies of Civil Cover Sheet

Enclosed herewith please also find a check in the amount of $350 to cover the filing fee and a copy of the Complaint and Summonses on CD.

Thank you for your consideration and attention to this matter.  If you have any questions, please do not hesitate to contact this firm at the above address.

Very truly yours,

Kenneth Rosellini