NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                            :
CHRISTOPHER H. KNIERIM, ET AL.,             :
                                            :         Civil Action No. 06-4935 (SDW)
         Plaintiffs,                        :
                                            :
v.                                          :         **OPINION**
                                            :
SIEMENS CORPORATION, ET AL.,                :
                                            :         March 31, 2008
         Defendants.                        :
_____        :

**WIGENTON,** District Judge.

    Before the Court is the motion of moving defendants Attwater Blue Corporation
("Attwater"), Ben Raue ("Raue"), and Jeff Hooper ("Hooper") ("defendants") to dismiss the
Amended Complaint (Docket Entry No. 12). Plaintiffs Christopher Knierim ("Knierim") and Jack
Zaccaria ("Zaccaria") ("plaintiffs") oppose this motion.

    Specifically, defendants seek to dismiss plaintiffs' Amended Complaint for lack of personal
jurisdiction against Raue and Hooper, pursuant to Fed. R.Civ. P. 12(b)(2); to dismiss the counts for
slander and tortious interference with prospective economic advantage for failure to state a claim,
pursuant to Fed. R. Civ. P. 12(b)(6); and to dismiss the breach of contract and the breach of the
implied covenant of good faith and fair dealing claims ("contract claims") for lack of subject matter
jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).

    Alternatively, defendants seek to dismiss the contract claims against Raue and Hooper for
failure to state a claim; to dismiss Knierim's two contract claims on the basis of improper venue,

pursuant to Fed. R. Civ. P. 12(b)(3); and to dismiss plaintiffs' claims for breach of the implied covenant of good faith and fair dealing for failure to state a claim.  Finally, to the extent any claims survive defendants' motion to dismiss, such as Zaccaria's contract claims against Attwater, defendants urge the Court to transfer any remaining claims to the United States District Court for the Northern District of Illinois, pursuant  to 28 U.S.C. § 1404(a).

This Court has considered only the moving, opposition, and reply papers submitted by the parties.[1]  For the reasons stated below, the Court will grant in part and deny in part defendants' motion to dismiss, and will transfer venue of Zaccaria's and Knierim's contract claims to the Northern District of Illinois.

## I.    BACKGROUND

This is a diversity suit brought by plaintiffs against Attwater, Raue, Hooper, Siemens Corporation ("Siemens")[2], Siemens Building Technologies ("SBT"), Gina Alladin (Alladin"), and Michael Bolinger ("Bolinger").  Plaintiffs allege that the moving defendants breached the independent contractor agreements between Attwater and plaintiffs, and that defendants defamed plaintiffs' reputation, and tortiously interfered with plaintiffs' prospective economic advantage in pursuing employment opportunities with The Right Thing, Inc. ("The Right Thing").  Plaintiffs, who are New Jersey residents, (Am. Compl. ¶¶ 2-3), allege the following in their Amended Complaint.

---

[1] On October 4, 2007, Magistrate Judge Arleo entered an Order, declining to consider the application of plaintiffs to strike the supplemental declaration of defendant Hooper, or alternatively, to file sur-reply (Docket Entry No. 26), and thus struck the application.  Judge Arleo further ruled that defendants' motion to strike plaintiffs' March 26, 2007, letter to the Court and attachments thereto (Docket Entry No. 29) would not be considered by the Court, and thus struck that motion as well.

[2] On December 22, 2006, plaintiffs voluntarily dismissed their claims against defendant Siemens without prejudice.

### A.    Allegations Common To Both Plaintiffs

In December 2004, Raue and Hooper incorporated Attwater in the state of Illinois for the purpose of creating a recruitment sourcing center to provide recruitment and staffing services exclusively for SBT, a division of Siemens.  (Am. Compl. ¶¶ 6, 11, 15.)  SBT, an Illinois corporation, manufactures, sells, distributes and installs products for nationwide industries, such as fire, building automation, energy and security.  (Am. Compl. ¶¶ 5, 13.)  Defendant Raue is the President of Attwater and a citizen of Illinois, and defendant Hooper is the Vice-President of Attwater and a citizen of Illinois.  Defendants Alladin and Bolinger are employed by Siemens in its human resource department.    Alladin lives in Raleigh, North Carolina, and Bolinger lives in Indianapolis, Indiana.  (Am. Compl. ¶¶ 9-10.)

In December 2004, Attwater was awarded a public bid for a one year vendor contract to provide Siemens and/or SBT with staffing services in various departments for all branch locations and corporate headquarters.  (Am. Compl. ¶ 15).  Alladin and Bolinger were responsible for the Attwater vendor contract.  (Am. Compl. ¶¶ 16,17, 29.)   Around this time, Attwater hired Knierim as a "name generation specialist" and Zaccaria as a "full cycle recruiter."  (Am. Compl. ¶ 26.)  They were hired as independent contractors at hourly rates of $70 and $35, respectively.  (Am. Compl. ¶¶ 27-28.)    In December 2005, SBT informed Attwater that the one-year contract would continue under the publicly bid terms and conditions for another six months until approximately July 2006. (Am. Compl. ¶ 30.)

### B.    Allegations Relating to Zaccaria's Claims

In November 2005, while Zaccaria was working as an independent contractor, he and Attwater attempted unsuccessfully to agree upon new employment terms.  Zaccaria continued to

work for Attwater as an independent contractor until January 2006 when Attwater terminated Zaccaria's independent contractor agreement, providing him with thirty days notice. (Am. Compl. ¶¶ 32-35.) The parties agreed that Zaccaria would continue to work as an independent contractor during this thirty day period. During this thirty-day notice period, however, Hooper informed Zaccaria by e-mail that his termination was effective immediately. Hooper and Raue further advised Zaccaria to cease all contact with SBT employees, but Attwater would pay Zaccaria for the remaining thirty days. (Am. Compl. ¶¶ 39-41.) Additionally, Attwater told unnamed Attwater employees and independent contractors and SBT personnel that Attwater terminated Zaccaria because of his poor performance rather than based on the result of failed employment negotiations. (Am. Compl. ¶ 36.)

In May 2006, Raue contacted Zaccaria concerning his re-hire as an independent contractor in the position of full cycle recruiter for Attwater. (Am. Compl. ¶ 43.) Around that time, Zaccaria and Attwater entered into an oral agreement, wherein Zaccaria would be rehired as an independent contractor at a monthly rate of $4,000, which was increased to $8,000 per month in June 2006. (Am. Compl. ¶¶ 46-47.)

In June 2006, another vendor, The Right Thing, outbid Attwater for the staffing and recruiting services vendor contract with SBT. In turn, SBT then reduced Attwater's contract role to that of associate vendor. In its role as "master vendor," The Right Thing was responsible for reviewing job requisition requests from SBT and then determining which requests would be handled by Attwater (akin to a general contractor and subcontractor relationship). (Am. Compl. ¶¶ 49, 51, 53.)

In August 2006, while still working as an independent contractor for Attwater, Zaccaria

contacted Terry Terhark ("Terhark"), the President of the Right Thing, seeking a recruiter position with the company.  (Am. Compl. ¶¶ 62-63.)  Terhark referred Zaccaria to Michael Gruber ("Gruber"), Vice-President of The Right Thing, and the "chief person in charge of the SBT [vendor] contract."  (Am. Compl. ¶ 64.)

In August 2006, Zaccaria participated in separate telephone interviews with both Gruber and Terhark.  Following the interviews, on September 7, 2006, Gruber contacted Alladin at SBT to inform her of these interviews and that The Right Thing was interested in pursuing Zaccaria as a job candidate.  (Am. Compl. ¶¶ 66-68.)  On that same day, Alladin and/or Bolinger advised Attwater of Zaccaria's interviews with The Right Thing and that company's interest in hiring him.  (Am. Compl. ¶ 69.)  Later that day, Hooper advised Zaccaria that his employment relationship was terminated effective immediately.  (Am. Compl. ¶ 70.)

On September 8, 2006, Zaccaria provided Attwater with his final invoice for services performed in the amount of $11,450 for July, August, and September 2006, which Attwater failed to pay.  (Am. Compl. ¶ 75.)  Additionally, following his termination, Zaccaria attempted to contact The Right Thing to inquire about the status of his job candidacy, but never received any response. (Am. Compl. ¶ 74.)

Then, on September 11, 2006, Gruber sought a reference for Zaccaria. Alladin gave him a favorable one.  The next day Terhark telephoned Hooper.  During their conversation, Hooper "bashed Zaccaria's reputation and advised Terhark [sic] to not pursue him further."[3]   After September 13, 2006, The Right Thing ceased all communications with Zaccaria.  (Am. Compl. ¶¶

---

[3] Terhark allegedly relayed this conversation to Knierim during his interview with Terhark for a prospective job on September 14, 2006.  (Am. Compl. ¶ 80.)

81-82.) At some unidentified point in time, Hooper apparently "gloated" to unnamed Attwater and SBT employees and/or independent contractors that "his bashing of plaintiffs' reputation and his threats to Terhark mean[t] that Knierim and Zaccaria are now a couple of 'train wrecks.'"  (Am. Compl. ¶ 100.)

### C.    Allegations Relating to Knierim's Claims

In mid-December 2005, Hooper made "several negative comments" to unnamed  Attwater employees, Alladin, and Bolinger.  Hooper then sent e-mails to Raue and Knierim, stating that Knierim and his "name generation lists are [a] f–king waste of time and useless."  (Am. Compl. ¶ 31.)  Knierim, however, continued to work for Attwater under the terms and conditions of the original independent contractor agreement.

In February 2006, Knierim entered into a new independent contractor agreement with Attwater (the "Knierim Contract").  (Am. Compl. ¶ 42.)   The Knierim Contract provides in relevant part that:

> Section 2.    **Establishment of Relationship.**  Company agrees to engage Contractor as an independent contractor specializing in the sourcing and recruitment of qualified candidates for the Company's clients in the Building Technologies markets ("Services").  Contractor accepts such engagement and agrees that he/she will devote such of his/her working time to the Company's business. . . .

> Section 3.    **Independent Contractor Status**.  Contractor is to be treated for all purposes as an independent contractor and not as an employee of Company.

> Section 4.    **Term of Engagement.**  The term of the Contractor's engagement hereunder shall commence on the Effective Date [October 1, 2005] and shall continue thereafter, subject to termination . . . including, but

not limited to, termination without cause, upon not less than twenty (30) [sic] days prior written notice by the Company to Contractor . . . .

Section 7.     **Conflicts.** Contractor hereby represents and warrants that Contractor is not presently engaged in or under any contract to engage in any other contractual agreement, or otherwise, that would conflict with this Agreement, and will not, during the term of this Agreement, undertake any other contractual agreements or projects. . .

Section 17.     **Governing Law**. This Agreement shall be subject to and governed by the laws of the State of Illinois and any and all actions must be brought in the state or federal court sitting in Cook County, Illinois.

(Ben Raue Decl., Ex. A).[4]

In August 2006, Knierim contacted Terhark as a reference for Zaccaria and to forward his own resume. (Am. Compl. ¶ 65.) A dinner interview was scheduled with Knierim for September 14, 2006 in New Jersey. (Am. Compl. ¶¶ 76-77.)

On the evening of September 13, 2006, Terhark informed Knierim that Hooper knew about the September 14th interview. (Am. Compl. ¶ 87.) Earlier that day, Hooper and Raue told Knierim that they knew of his job pursuit with The Right Thing and that he had a legal obligation under the Knierim Contract to advise them if he is contacted by an Attwater competitor, including The Right

----

[4] As a general rule, a district court deciding a motion to dismiss may not consider matters outside of the pleadings. In Re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citing Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985)). However, there exists an exception to that general rule in that a "document *integral to or explicitly relied* upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment." In Re Burlington Coat Factory, 114 F.3d at 1426 (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)). Here, plaintiffs' Amended Complaint explicitly refers to the Knierim Contract. Moreover, his contract claims are predicated on the terms and conditions of the Knierim Contract. Accordingly, this Court may consider the document in ruling on defendants' instant motion to dismiss.

Thing.  (Am. Compl. ¶¶ 83- 84.)  Hooper and Raue further indicated that they were contemplating the termination of Knierim's employment relationship with Attwater.  (Am. Compl. ¶ 86.)

On September 16, 2006, Knierim advised Terhark that the Knierim Contract did not contain a non-compete clause.  (Am. Compl. ¶ 92.)  Although Terhark assured Knierim that he would soon alert Knierim about The Right Thing's hiring decision, Knierim never received any response from the company.  (Am. Compl. ¶¶ 93, 94.)

On September 21, 2006, Hooper informed Knierim that he was terminated.  (Am. Compl. ¶ 96.)  Knierim then sent a final invoice for his services performed through September 21, 2006 to Attwater.  The invoice was in the amount of $16,704.86, which included the 30-day buyout as per the provision in the Knierim Contract.  (Am. Compl. ¶ 97.)  Attwater, however, failed to pay Knierim's submitted invoice.  Hooper informed Knierim that Attwater would not pay the invoice and that Knierim should not contact SBT either for employment or a job reference.  Moreover, Hooper stated that he was "going to speak to Tanya (an Attwater employee and a former Quintegra employee")[5] to ensure that Quintegra would never reemploy Knierim. (Am. Compl. ¶ 99.)  Hooper also apparently "gloated" to unnamed employees and/or independent contractors of Attwater and to SBT employees that "his bashing of Plaintiffs' reputation and his threats to Terhark mean[t] that Knierim and Zaccaria are now a couple of 'train wrecks.'"  (Am. Compl. ¶ 100.)

## II.    DISCUSSION

### A.    Legal Standard Establishing Personal Jurisdiction

A federal court typically must conduct a two-step analysis to ascertain whether personal

---

[5] Before entering his independent contractor relationship with Attwater in or about December 2004, Knierim had previously worked for Quintegra.  (Am. Compl. ¶ 22.)

jurisdiction exists.  First, the court must look to the forum state's long-arm statute to determine if

personal jurisdiction is permitted over the defendant.  Second, the court must determine whether the

exercise of personal jurisdiction would be repugnant to the Due Process Clause of the Fourteenth

Amendment.  <u>IMO Indus., Inc. v. Kiekert AG</u>, 155 F.3d 254, 259 (3d Cir. 1998); <u>Vetrotex</u>

<u>Certaineed Corp. v. Consol. Fiber Glass Prods Co.</u>, 75 F.3d 147, 150 (3d Cir. 1996).

    In this forum, the inquiry may be collapsed into a single step because New Jersey's long arm

statute permits the exercise of personal jurisdiction "consistent with due process of law."  N.J. Civ.

R. 4:4-4.  As such, this Court will allow out-of-state service "to the uttermost limits permitted by the

United States Constitution."  <u>Mesalic v. Fiberfloat Corp.</u>, 897 F.2d 696, 698 (3d Cir. 2002) (quoting

<u>Charles Gendler & Co., Inc. v. Telecom Equip. Corp.</u>, 102 N.J. 460, 469 (1986)).

    The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state

defendant only where "the defendant purposefully avails itself of the privilege of conducting

activities within the forum State, thus invoking the benefits and protections of its laws."  <u>Burger</u>

<u>King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985) (quoting <u>Hanson v. Denckla</u>, 357 U.S. 235

(1958)).  A nonresident defendant need not be physically present within the forum to establish

personal jurisdiction.  <u>IMO Indus.</u>, 155 F.3d at 259.  It is the burden of the plaintiff to prove that the

defendant has purposefully availed himself of the forum state. <u>See</u> <u>Burke v. Quartey</u>, 969 F. Supp.

921, 924 (D.N.J. 1997).

    To prove that the defendant has purposefully availed itself of the burdens and benefits of a

given state, a plaintiff may rely upon a defendant's specific contacts with the forum state.  The

burden to produce actual evidence of the defendant's contacts with the forum state rests on the

plaintiffs. <u>See</u> <u>Time Share Vacation Club v. Atlantic Resorts, Ltd.</u>, 735 F.2d 61, 66 & n.9 (3d Cir.

1984).  In reviewing a motion to dismiss for lack of personal jurisdiction, a district court must

accept, as true, all of the plaintiff's allegations and construe the facts in plaintiff's favor.  Carteret

Sav. Bank v. Shushan, 954 F.2d 141, 142 n. 1 (3d Cir. 1992).  However, "[o]nce the plaintiff has

made out a prima facie case in favor of personal jurisdiction, the defendant 'must present a

compelling case that the presence of some other considerations would render jurisdiction

unreasonable.'"  Id. at 150  (quoting Burger King, 471 U.S. at 477).

Personal jurisdiction pursuant to such contacts is known as specific jurisdiction.  Specific

jurisdiction is invoked when a claim is related to or arises out of the defendant's contacts with the

forum.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984); Dollar

Sav. Bank v. First Sec. Bank of Utah, N.A., 746 F.2d 208, 211 (3d Cir. 1984).  First, a plaintiff must

show that the defendant had the minimum contacts with the forum necessary for the defendant to

have "reasonably anticipate[d] being haled into court there."  World-Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 297 (1980) (citations omitted).

What constitutes minimum contacts varies with the "quality and nature of defendant's

activity."  Hanson, 357 U.S. at 253.  In assessing the sufficiency of minimum contacts for personal

jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the

litigation."  Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 770 (1984).  Otherwise stated, there

must be at least "a single deliberate contact" with the forum state that relates to the cause of action.

U. S. Golf Ass'n v. U. S. Amateur Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J. 1988).  The unilateral

acts of the plaintiff, however, will not amount to minimum contacts.  Helicopteros Nacionales de

Colombia, 466 U.S. at 414; Hanson, 357 U.S. at 253.

Second, assuming minimum contacts have been established, a court must inquire whether

10

"the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King Corp. 471 U.S. at 476 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)). See also Pennzoil Products Co. v. Colelli & Associates, Inc., 149 F.3d 197, 201 (3d Cir. 1998). For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. World-Wide Volkswagen, 444 U.S. at 292. To determine reasonableness, a court considers the following factors: the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering substantive social policies. Id.

Here, this Court will analyze whether plaintiffs have met their burden of establishing the Court has specific jurisdiction over Raue and Hooper. Additionally, "because there are different considerations in analyzing jurisdiction over contract claims and over certain tort claims," the court will engage in a claim-specific analysis. Remick v. Manfredy, 238 F.3d 248, 255-56 (3d Cir. 2001) (finding personal jurisdiction over nonresident client defendant regarding breach of contract claim but not as to plaintiff's defamation and misappropriation of image claims).

**B.    Personal Jurisdiction Over Plaintiffs' Contract Claims**

Plaintiffs each allege two claims relating to their respective contracts in the Amended Complaint: (1) breach of contract (Count Two); and (2) implied covenant of good faith and fair dealing (Count Three). They are asking the Court to exercise personal jurisdiction regarding these contract claims over Attwater, a corporation, as well as Hooper and Raue, two individuals in their corporate and individual capacities.

11

Defendants contend that the Amended Complaint does not make any specific assertions to sustain a finding of personal jurisdiction over Raue and Hooper. (Def. Br. 7.) Additionally, defendants assert that Raue and Hooper have no personal or business contacts in New Jersey, own no property in this forum state, and have not socially visited the state in at least five years. (Def. Br. 7-8; Decl. of Raue ¶¶ 3-4; Decl. of Hooper ¶¶ 2-3.) Finally, they suggest that plaintiffs cannot establish personal jurisdiction because they do not connect the alleged contacts to any of their claims.

On the other hand, plaintiffs argue that this court has jurisdiction over Raue and Hooper because they purposefully directed their business activities at residents of New Jersey as follows:

- Raue and Hooper solicited plaintiffs for positions with Attwater as independent contractors. (Knierim Decl. ¶ 6; Zaccaria Decl. ¶¶ 10-13);

- Raue and Hooper identified themselves as owners of Attwater. (Knierim Decl. ¶¶ 4, 9);

- Raue advised Knierim that "we would be doing extensive work in New Jersey" for which Knierim's experience would be helpful. (Knierim Decl. ¶ 7);

- Approximately 19% of the 215 "major jobs" that Knierim performed for Attwater from the period of November 2005 until August 2006 were performed in New Jersey. (Knierim Decl. at ¶ 13);

- Raue and Hooper told Knierim about specific New Jersey based companies on which Knierim should focus his efforts for obtaining names of potential recruitment candidates. (Knierim Decl. at ¶¶ 15, 18-19);

- Raue and Hooper communicated with both Knierim and Zaccaria, who were in New Jersey, several times each week. (Knierim Decl. ¶¶ 20-21; Zaccaria Decl. ¶¶ 16, 45-46);

- Through instant messaging exchanges, Raue and/or Hooper advised Knierim that they were working on recruiting projects, including some located in New Jersey. (Knierim Decl. ¶ 27);

- During conference calls with potential job candidates, Hooper referenced the

"East Coast" office in New Jersey and "Mid-West" office of Attwater. (Knierim Decl. ¶¶ 24-25);

• During other conference calls, Hooper engaged in recruiting activities directed at New Jersey employees. (Knierim Decl. at ¶ 26);

• Raue and Hooper told Knierim about their attempts to solicit additional business in New Jersey from SBT as well as other New Jersey based companies. (Knierim Decl. ¶¶ 29-30; Zaccaria Decl. ¶ 42);

• Zaccaria participated in meetings between Raue, Hooper, and an SBT representative in New Jersey. (Zaccaria Decl. ¶ 18);

• When Zaccaria worked on jobs located in New Jersey, Raue and Hooper often instructed him to limit his recruiting efforts to individuals who either lived or worked in that state. (Zaccaria Decl. at ¶¶ 27, 32);

• Raue and Hooper performed recruiting jobs within New Jersey along side other Attwater recruiters. (Knierim Decl. ¶ 31); and

• Raue and Hooper mailed plaintiffs their pay checks, and sent Knierim personal greetings cards and other "various" documents to his New Jersey residence. (Knierim Decl. ¶ 34; Zaccaria Decl. ¶ 47).

In determining whether personal jurisdiction can be established in connection with a breach of contract claim, the court "must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing." Remick, 238 F.3d at 256. In Keeton, the Supreme Court expressly noted that "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him . . . . Each defendant's contacts with the forum state must be assessed individually." 465 U.S. at 781 n.13. The Third Circuit has emphasized that "jurisdiction over the [individual] defendants does not exist simply because they are agents or employees of organizations which presumably are amenable to jurisdiction in" a specific forum. Nicholas v. Saul Stone & Co., 224 F.3d 179, 184 (3d Cir. 2000) (citing Keeton, 465 U.S. at 781).

In <u>Moneygram Payment Systems, Inc. v. Consorcio Oriental, S.A.</u>, 65 Fed. Appx. 844, 850 (3d Cir. 2003), the Third Circuit found that the corporate plaintiff could not establish personal jurisdiction over the two individual defendants, who were allegedly owners and officers of the defendant corporate entity by reciting the defendant corporation's contacts with New Jersey. The Third Circuit found that, while the plaintiff established a basis for personal jurisdiction over the corporate defendant, the plaintiff's complaint fell "woefully short" of demonstrating the connection necessary to extend personal jurisdiction to either of the two individual defendants. <u>Id.</u>

Applying that standard, this Court is satisfied that personal jurisdiction does not exist over Hooper or Raue with respect to plaintiffs' contract claims. In their declarations, plaintiffs point exclusively to contacts between plaintiffs and Attwater in New Jersey, regarding the formation and alleged breach of the employment contracts. However, those contacts are not sufficiently independent of Attwater to establish specific jurisdiction.

Indeed, the declarations are devoid of any contacts that Hooper and Raue have with New Jersey, separate and apart from Attwater. Specifically, many of the factual allegations set forth in plaintiffs' declarations concern recruiting efforts, day to day business operations, and work performed in New Jersey. Plaintiffs, however, miss the point. These facts do not inform the jurisdictional analysis as to the individual defendants. To establish jurisdiction over plaintiffs' contract claims, they must demonstrate independent participation of Hooper and Raue in the "contract negotiations, the terms of the contract and the parties' actual course of dealings." <u>Remick</u>, 238 F.3d at 256. No such showing has been made here.

Therefore, Hooper and Raue do not have the requisite minimum contacts in their corporate or individual capacities. Thus, plaintiffs have not alleged a sufficient basis for exercising personal

14

jurisdiction over them.  Accordingly, the Court grants defendants' motion to dismiss plaintiffs'

breach of contract and implied covenant of good faith and fair dealing claims against Raue and

Hooper for lack of personal jurisdiction under Fed. R.Civ. P. 12(b)(2).[6]

### C.    Personal Jurisdiction Over Plaintiffs' Defamation[7] and Tortious Interference Claims

While plaintiffs assert that their tortious interference with prospective economic advantage

and defamation claims are separate and distinct, the allegations supporting both claims are

intertwined with one another.  Plaintiffs' tortious interference claims arise out of Attwater's alleged

mischaracterization of the employment relationship between Attwater and plaintiffs as conveyed to

The Right Thing, which, in turn, "supports the specificity of Plaintiffs' allegations of slander." (Pl.

Br. 24.)  Accordingly, this Court will address all allegations together, which are pled in support of

both intentional torts claims.  (See generally Am. Compl.)

Knierim alleges that Hooper advised him that Hooper "was going to speak to Tanya," (an

Attwater employee and a former Quintegra employee) to ensure there would be no chance of

Quintegra ever reemploying Knierim. (Am. Compl. ¶ 99.)  Plaintiffs together contend that Hooper

made alleged negative comments about plaintiffs' reputation to their prospective employer, The

---

[6] Because the Court will dismiss plaintiffs' contract claims against Raue and Hooper for lack of personal jurisdiction, the Court declines to address defendants' alternative argument that plaintiff's contract claims be dismissed against Raue and Hooper because they are not parties to the disputed written and oral contracts, respectively. (See Def. Moving Br. Point IV.)

[7] Plaintiffs' first cause of action is entitled, "slander," in their Amended Complaint. However, they use interchangeably the legal claims of "slander" and "defamation" throughout their Amended Complaint and opposition papers to describe their first count.  As some of the defamatory statements were made in writing, which is called libel, and some statements were made orally, which is called slander, for simplicity, this Court will refer to plaintiffs' first cause of action as a claim for defamation.

Right Thing. These negative comments coupled with Hooper's prior "negative" statements to unidentified employees and independent contractors of Attwater and SBT, wherein he gloated that he "bashed" plaintiffs' reputations, made "threats" to Terhark, advised Terhark not to pursue Zaccaria further, and described plaintiffs as a "couple of train wrecks," form the basis of both plaintiffs' defamation and tortious interference claims. Additionally, Knierim has alleged that, in December of 2005, Hooper made "several negative comments to employees of Attwater and to Alladin and Bolinger," and then sent e-mails to Raue and Knierim, stating that Knierim and his "name generation lists are [a] f--king waste of time and useless." (Am. Compl. ¶ 31.)

In Calder v. Jones, 465 U.S. 783 (1984), the Supreme Court set forth the standard for determining personal jurisdiction over a nonresident defendant who committed an alleged intentional tort outside of the forum state. The Calder case arose from an allegedly libelous National Enquirer article written about the activities of a Hollywood celebrity in California, her state of residence. The article was written and edited in Florida, but published nationwide. As a California resident and entertainer, the plaintiff alleged that the article had the most significant impact in California. The Supreme Court held that personal jurisdiction existed over the author and editor defendants in California because the "effects" of the defendants' conduct in Florida were primarily felt in California, where the plaintiff lived and worked. Id. at 789. The Supreme Court emphasized that the defendants committed an intentional tort, rather than mere negligence, which was aimed directly at a resident in California - the forum state. Id.

The Third Circuit applied the Calder "effects" test in the IMO case where the Court held that the test requires the plaintiff to demonstrate the following prongs:

> (1) The defendant committed an intentional tort;

16

> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

IMO, 155 F.3d at 265-66.  The IMO Court emphasized that, under the third prong, the plaintiff must show that "the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum."  Id. at 266.

Applying the three-part test set forth in  IMO, this Court concludes that plaintiffs have not established personal jurisdiction over Hooper and Raue with respect to their intentional tort claims.  While plaintiffs have alleged an intentional tort, they have failed to show that they suffered the brunt of their harm in New Jersey.  Although there is no dispute that plaintiffs are residents of New Jersey, Knierim's own declaration states that only 9% of all the work he performed for Attwater took place in New Jersey.  (Knierim Decl. ¶ 13.)  Indeed, Zaccaria's declaration is silent on where the majority of his work was performed.  Rather, in his supporting declaration, Hooper stated, that of the 65 jobs to which Zaccaria was assigned during his tenure with Attwater, Zaccaria performed approximately 89.23% of all his  job projects outside the state of New Jersey.  (Hooper Decl. ¶ 3.)  As such, it is unclear whether either plaintiff was located in New Jersey at the time any of Hooper's alleged defamatory, slanderous, and/or malicious statements or tortious interference conduct.

Indeed, plaintiffs allege that Hooper made negative comments about plaintiffs' reputation to their prospective employer, The Right Thing.  However, plaintiffs do not allege in which state Hooper, an Illinois resident, and any representative of The Right Thing, an Ohio corporation, (Am.

17

Compl. ¶ 49), were located at the time such comments were allegedly uttered.  Additionally, Hooper's alleged prior defamatory statements to unidentified employees and independent contractors of Attwater and SBT are not only vague in nature but do not identify the names and/or locations of the intended recipients.  Finally, as to Knierim's allegation that, in December of 2005, Hooper made "several negative comments to employees of Attwater and to Alladin and Bolinger," and then sent sent e-mails to Raue and Knierim, stating that Knierim and his "name generation lists are [a] f--king waste of time and useless," (Am. Compl. ¶ 31), Knierim does not state where he or Hooper were located at the time Hooper made the "negative comments," and Knierim received Hooper's email. Similarly, Knierim does not allege where Hooper and he were located at the time of the verbal exchange concerning Knierim's "legal obligations" under the Knierim Contract.

Additionally, while Knierim alleges that he had an in person interview with Terhark in New Jersey, (Am. Compl. ¶¶ 76-77, 80), Zaccaria merely alleges that he participated in telephone interviews with Terhark and Gruber.  Zaccaria fails to state whether he was located in New Jersey during the interviews.  (Am. Compl. ¶¶ 66-67.)  Indeed, neither plaintiff even alleges that they were seeking employment with The Right Thing in a New Jersey location.  Knierim fails to allege in which state Hooper and Terhark were located when Hooper allegedly indicated that Knierim was bound to the Knierim Contract, containing the non-compete clause.  Finally, Knierim fails to allege in which state Hooper or Tanya (an Attwater employee and a former Quintegra employee) were located when Hooper allegedly informed Knierim that he was "going to speak to Tanya" to ensure that Quintegra would never rehire Knierim. (Am. Compl. ¶ 99.)

Accordingly, plaintiffs have not reasonably shown that Hooper's alleged defamatory statements or tortious interference actions were directed at plaintiffs in New Jersey such that

18

plaintiffs suffered the brunt of their harm in New Jersey. Therefore, plaintiffs cannot satisfy the second prong of the IMO test. Equally significant, plaintiffs do not specifically allege that defendant Raue uttered any defamatory statements or committed any tortious interference conduct against them. On this basis alone, they cannot satisfy the second part of the IMO test as to Raue.

Even assuming this Court could conclude that plaintiffs have sufficiently shown that they sustained the brunt of their harm in New Jersey, the Court does not find that Hooper and/or Raue expressly aimed their tortious conduct at New Jersey, such that the forum can be said to be the focal point of the tortious activity. First, as noted above, plaintiffs do not contribute any defamatory statements or otherwise tortious conduct to Raue personally. Second, as to Hooper, there are no allegations that any false statements or otherwise tortious conduct, other than possibly one allegedly defamatory e-mail that he sent to Raue and Knierim, were directed to plaintiffs in New Jersey. Therefore, plaintiffs do not satisfy the third prong of the IMO test as to Hooper and Raue.

In light of the foregoing, this Court concludes that it does not have personal jurisdiction over Raue or Hooper in connection with plaintiffs' defamation or tortious interference with prospective economic advantage claims. Therefore, the Court grants defendants' motion to dismiss plaintiffs' slander (defamation) and tortious interference with prospective economic advantage claims against Raue and Hooper for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).

**D.     Jurisdictional Discovery**

In the alternative, plaintiffs submit that the Court should stay the motion, pending discovery, on the issue of personal jurisdiction. (Pl. Br. 11-12.) They contend that they should have the benefit of discovery to unearth facts regarding personal jurisdiction.

A court has discretion to allow a party to proceed with discovery when considering a motion

to dismiss based on lack of personal jurisdiction.  See Massachusetts School of Law at Andover, Inc. v. American Bar Assoc., 107 F.3d 1026, 1042 (3d Cir. 1997); Renner v. Lanard Toys Ltd., 33 F.3d 277, 283 (3d Cir. 1994).  Jurisdictional discovery may be permitted unless the plaintiff's claims are "clearly frivolous."  See Massachusetts School of Law, 107 F.3d at 1042.  The plaintiff bears the burden of providing sufficient evidence of contact with the forum state in order to establish personal jurisdiction.  As such, a court may deny a request for jurisdictional discovery when the plaintiff fails to establish a prima facie showing of personal jurisdiction.  See Massachusetts School of Law, 107 F.3d at 1042.  However, if a plaintiff can present factual allegations that suggest "with reasonable particularity" the possible existence of the requisite "contacts between [the party] and the forum state," the plaintiff should have a right to conduct jurisdictional discovery.  Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003) (citing Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)).

In cases where the plaintiff has met this required threshold, courts within this Circuit have sustained the right to conduct discovery before the District Court dismisses for lack of personal jurisdiction.  See Toys "R" Us, Inc., 318 F.3d at 456.  However, that jurisdictional discovery generally relates to a corporation and whether it is "doing business" in the forum state.  In cases where the defendant is an individual, the presumption in favor of jurisdictional discovery is reduced. Massachusetts School of Law, 107 F.3d at 1042; see also Shaw v. Boyd, 658 F. Supp. 89, 91 n. 1 (E.D. Pa. 1987).

In the instant matter, defendants Raue and Hooper are individuals.  Thus, the presumption for jurisdictional discovery is reduced.  See Massachusetts School of Law, 107 F.3d at 1042 ("Jurisdictional discovery generally relates to corporate defendants and the question of whether they

are 'doing business' in the state.")

       As set forth in detail above, the Court finds that plaintiffs fail to present factual allegations

that suggest with "reasonable particularity" the existence of the necessary contacts between Hooper

and Raue and New Jersey, separate and distinct from Attwater's business contacts with the forum

state on their contract claims.  Plaintiffs also fail to assert sufficient factual allegations to show that

they sustained the brunt of their harm in New Jersey regarding their intentional tort claims, or that

Hooper and/or Raue expressly aimed their tortious conduct at New Jersey, such that the forum can

be said to be the focal point of the tortious activity.  Accordingly, the Court denies plaintiffs' request

for jurisdictional discovery because, based on the record before the Court, plaintiffs cannot establish

a prima facie showing of personal jurisdiction.

      **E.**      **Defendants' Motion To Dismiss The Intentional Tort**
                   **Claims For Failure To State A Claim**

              1.        Fed.R.Civ.P. 12(b)(6) Standard

       Defendants seek to dismiss plaintiffs' defamation and tortious interference with prospective

economic advantage claims for failing to state a claim upon which relief can be granted under

Fed.R.Civ.P. 12(b)(6).  As a preliminary matter, the Court notes that it has already determined Raue

and Hooper are not subject to personal jurisdiction in New Jersey regarding plaintiffs' intentional

tort claims.  As such,  the Court need not reach the question of whether plaintiffs' intentional tort

claims state a claim against Hooper and Raue, respectively.  Rather, the Court will limit its analysis

under Rule 12(b)(6) to the defamation and tortious interference claims against Attwater alone.

       "Generally, an employer is liable for intentional torts, including defamation, committed by

its employees within the scope of their employment." Genesis Int'l Holdings v. Northrop Grumman

21

Corp., 238 Fed. Appx. 799, 802, 2007 WL 1821680 *2 (3d Cir. 2007 Jun. 26, 2007) (citing Printing

Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739 (N.J. 1989)).

When reviewing a motion under Rule 12(b)(6), the Court must accept the allegations in the

Complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse v. Lower

Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Recently, in Bell Atlantic Corp. v. Twombly,

_ U.S. _, 127 S. Ct. 1955, 1964 (2007), the Supreme Court clarified the standard for reviewing Rule

12(b)(6) motions.  The Supreme Court directed that "[f]actual allegations must be enough to raise

a right to relief about the speculative level."  Id. at 1965.  In other words, the Court is not required

to accept those allegations which amount to mere "unsupported conclusions and unwarranted

inferences."  Doug Grant, Inc. v. Greate Bay Casino, Corp., 232 F.3d 173, 184 (3d Cir. 2000).  See

Fed. R. Civ. P. 8(a)(2).

### 2.    Choice of State Substantive Law: Defamation

In this diversity action, the Court next must consider which state's substantive law applies

before determining whether plaintiffs' defamation and tortious interference claims survive

defendants' 12(b)(6) motion.  The Court must apply those choice-of-law rules of the forum state to

decide what law will govern the substantive issues in the case.  Klaxon Co. v. Stentor Elec. Mfg.

Co., 313 U.S. 487, 496 (1941).  Accordingly, here, the Court must apply New Jersey choice-of-law

rules.  "New Jersey has a flexible governmental-interest approach to resolving choice of law

questions that requires application of the law of the state with the greatest interest in resolving the

particular issue."  Lebegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006).  Following the

Restatement (Second) of Conflict of Laws, New Jersey uses an issue-by-issue approach when

determining which substantive law to apply.  Id.

22

New Jersey's governmental-interest test consists of two steps.  First, the Court must decide whether an actual conflict exists between the substantive laws of the interested states.  Warriner v. Stanton, 475 F.3d 497, 501 (3d Cir. 2007) (citing Veazey v. Doremus, 103 N.J. 244 (N.J. 1986)). Only if the Court concludes that there is an actual conflict, should it then examine the second prong. See High v. Balun, 943 F.2d 323, 325 (3d Cir. 1991).  The second step requires the Court to "'identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.'" Warriner, 475 F.3d at 501 (quoting Veazey, 103 N.J. at 244).

The Court must first address whether a conflict exists between the pleading requirements of a defamation claim under New Jersey law with a defamation claim under Illinois law.  New Jersey and Illinois are both interested states.  Plaintiffs are New Jersey residents.  On the other hand, defendants Attwater, Hooper and Raue are citizens of Illinois with Hooper and Raue living in that state.

To state a claim for defamation under New Jersey law, a plaintiff's Complaint must sufficiently assert "(1) a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to a person or persons other than the plaintiff; (5) with actual knowledge that the statement was false or with reckless disregard of the statement's truth or falsity or with negligence in failing to ascertain the truth or falsity; and (6) which caused damage." Doug Grant Inc. v. Greate Bay Casino Corp., 3 F. Supp.2d 518, 538 (D.N.J. 1998) (citing Feggans v. Billington, 291 N.J.Super. 382, 391 (App.Div.1996)).

To state a claim for defamation under Illinois law, the plaintiff must allege sufficient facts demonstrating that: (1) defendants made a false statement about the plaintiff; (2) an unprivileged

publication was made to a third party with fault of the defendant; and (3) such a publication caused damage to the plaintiff.  Krasinski v. United Parcel Serv., 124 Ill.2d 483, 490 (Ill. 1988) (citing Restatement (Second) of Torts § 558 (1977)).  Comparing the pleading requirements, it is clear that the elements for stating a claim for defamation under the common law of New Jersey and Illinois are materially similar.  Accordingly, this Court concludes that no actual conflict exists, and thus the inquiry ends. Therefore, this Court must apply New Jersey substantive law.  See Lebegern, 471 F.3d at 428.

3.    Plaintiffs Fail to State a Claim for Defamation

The Court next considers whether plaintiffs have stated a claim for defamation under New Jersey law.  As set forth above, see discussion supra Part II.C, plaintiffs' factual allegations of defamation are intertwined with their allegations supporting their tortious interference claims.  The collective allegations are restated as follows:  Hooper made alleged negative comments about plaintiffs' reputation to The Right Thing.  These negative comments coupled with Hooper's prior "negative" statements to unidentified employees and independent contractors of Attwater and SBT, wherein he gloated that he"bashed" plaintiffs' reputations, made "threats" to Terhark, advised Terhark not to pursue Zaccaria further, and described plaintiffs as a "couple of train wrecks," form the basis of both plaintiffs' defamation claims.  (Am. Compl. ¶¶ 80, 100; Pl. Br. 23-24.)

Additionally, Knierim has alleged that, in December of 2005, Hooper made "several negative comments to employees of Attwater and to Alladin and Bolinger," and then sent e-mails to Raue and Knierim, stating that Knierim and his "name generation lists are [a] f--king waste of time and useless." (Am. Compl. ¶ 31.)  Knierim also contends that Hooper told him to advise the company of any contact by a competitive company of Attwater – including any contact from The Right Thing,

24

despite there being no "non-compete" clause in Knierim's contract.  (Am. Compl. ¶¶ 84-85.)
Finally, Knierim alleges that Hooper informed him that Hooper "was going to speak with Tanya"
to ensure that Knierim would never become reemployed with his Quintegra, his former employer.
(Am. Compl. ¶ 99.)

"Whether the meaning of a statement is susceptible of a defamatory meaning is a question
of law for the court."  Ward v. Zelikovsky, 136 N.J. 516, 529 (1994).  When faced with the question
of whether a statement is defamatory, a court "must consider the content, verifiability, and context
of the challenged statements."  Id.  "The 'content' analysis requires courts to consider the 'fair and
natural meaning that will be given [to the statement] by reasonable persons of ordinary
intelligence.'"  DeAngelis v. Hill, 180 N.J. 1, 14 (N.J. 2004) (quoting Ward, 136 N.J. at 529 and
Romaine v. Kallinger, 109 N.J. 282, 290 (1988)).  A defamatory statement amounts to one that is
false and injurious to another's reputation.  Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d
186, 189 (3d Cir. 1998).  A plaintiff must plead facts "sufficient to identify the defamatory words,
their utterer and the fact of their publication.  A vague conclusory allegation is not enough."
Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 101 (App. Div. 1986) (internal citations omitted).
In that vein, while the "use of epithets, insults, name-calling, profanity and hyperbole may be hurtful
to the listener and are to be discouraged, . . . such comments are not actionable."  DeAngelis, 180
N.J. at 14 (citing Ward, 136 N.J. at 529-30).

A court's analysis of verifiability compels a determination be made as to whether "the
statement is one of fact or opinion," id., because statements of opinion and name-calling, which
cannot be proved true or false, are not actionable.  McLaughlin v. Rosanio, Bailets & Talamo, Inc.,
331 N.J. Super. 303, 312 (App. Div.), cert. denied, 166 N.J. 606 (2000).  The New Jersey Supreme

Court has noted that, "[o]pinion statements reflect a state of mind.  Although they do not enjoy a wholesale defamation exception, opinion statements do not trigger liability unless they imply false underlying objective facts.  Loose, figurative or hyperbolic language is not likely to imply specific facts, and thus is not likely to be deemed actionable." Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 167-68 (1999).

This Court examines the content, verifiability, and context of each of Hooper's statements.  First, plaintiffs' allegation that, in December of 2005, Hooper made "several negative comments to employees of Attwater and to Alladin and Bolinger," (Am. Compl. ¶ 31), is vague on its face.  The allegation does not state with any certainty that the negative comments were made about either, let alone, both plaintiffs.  Additionally, what was actually said is not described with any particularity, but rather the statements are generally referred to as being "negative" in nature.  Thus, plaintiffs have not satisfied the requirement of sufficiently asserting a false and defamatory statement concerning plaintiffs to support a claim of defamation.

The allegation that Hooper allegedly "based Zaccaria's reputation to Terhark," (Am. Compl. ¶ 80), suffers the same fate.  It is facially vague and conclusory, and thus, is insufficient to support a claim for defamation.  Plaintiffs' allegation that Hooper "gloated" to unidentified Attwater and SBT employees and independent contractors about bashing Plaintiffs' reputations, threatening Terhark, advising Terhark not to further pursue Zaccaria, reducing Knierim and Zaccaria to be a couple of 'train wrecks,'" (Am. Compl. ¶ 100), fails to describe with any particularity what words Hooper uttered, which arguably amount to "bashing" plaintiffs' reputations.  Moreover, plaintiffs' allegation does not identify by name those third parties to whom Hooper allegedly made any defamatory comments.  Additionally, describing plaintiffs as "a couple of train wrecks," amounts

to name-calling, which is not actionable.  DeAngelis, 180 N.J. at 14 (citing Ward, 136 N.J. at 529-30).  Finally, plaintiffs do not describe the alleged "threats" that Hooper made to Terhark, and how, if at all, such alleged threats are defamatory towards plaintiffs.  See Zoneraich, 212 N.J.Super. at 101 (noting that a plaintiff "must plead facts sufficient to identify defamatory words, their utterer, and the fact of their publication."); Miele v. Rosenbaum, 254 N.J. Super. 8, 13 (App. Div. 1991) (concluding that vague allegations are insufficient to support a claim of defamation).

Knierim further alleges that Hooper advised him of Hooper's intent to speak with Tanya to ensure that Knierim would never become reemployed by Quintegra.  On its face, the statement contains no defamatory words.  Moreover, plaintiffs merely allege that Hooper said that he was going to speak with Tanya sometime in the future; however, absent from the allegation is that Hooper actually uttered any defamatory statements about Knierim to Tanya.  With respect to Knierim's allegation that Hooper improperly told him to alert Attwater of any contact with competitors of the defendant company, this statement is facially devoid of any defamatory meaning. Accordingly, this Court finds that each of plaintiffs' allegations are vague, and thus insufficient to sustain a claim of defamation.

Lastly, plaintiffs' allegation that, in December of 2005, Hooper sent emails to "Raue and Knierim saying that Knierim and his 'name generation lists are a f--king waste of time and useless," (Am. Compl. ¶ 31), at most constitutes a non-actionable statement of opinion rather than fact about Knierim's work product.  Such an opinion statement does not trigger liability here because it does not imply any false underlying objective facts.  See Lynch, 161 N.J. at 167-68.   In light of the foregoing vague and opinion statements, which are insufficient to support a claim of defamation, this Court grants defendants' motion to dismiss plaintiffs' defamation claims against Attwater pursuant

to <u>Fed. R. Civ. P.</u> 12(b)(6).

        4.    <u>Choice of State Substantive Law: Tortious Interference</u>

The Court next considers whether a conflict exists between the pleading requirements of a tortious interference with prospective economic advantage claim under the common law of New Jersey and Illinois. To state a claim for tortious interference with a prospective economic advantage under New Jersey law, a plaintiff must allege sufficient facts: (1) that the plaintiff had a "reasonable expectation of economic advantage;" <u>Harris v. Perl</u>, 41 N.J. 455, 462 (1964), (2) that the defendant's interference was done intentionally and with malice; (3) that a conclusion can be drawn that the defendant's interference cause the plaintiff to lose a prospective economic gain; and (4) that the loss of the prospective gain caused the plaintiff to suffer damages. <u>Printing Mart-Morristown</u>, 116 N.J. at 751-52.

To state a claim for tortious interference with a prospective economic advantage under Illinois law, a complaint must allege sufficient facts: (1) the existence of valid business relationship or expectancy of one; (2) defendant's knowledge of the business relationship or expectancy; (3) defendant's intentional interference with the relationship or expectancy; and (4) resulting damages to the plaintiff. <u>Down & Down, Ltd. v. Gleason</u>, 181 Ill.2d 460, 484, 693 N.E.2d 358, 370 (Ill. 1998). Having compared the pleading requirements, the Court finds that both states' laws have similar elements that a plaintiff must allege to state a claim for tortious interference with prospective economic advantage. As such, this Court concludes that no actual conflict exists, and thus, need not proceed to the second prong of New Jersey's governmental-interest approach. Accordingly, this Court must apply New Jersey substantive law. <u>See</u> <u>Lebegern</u>, 471 F.3d at 428.

5.      Plaintiffs Fail to State a Claim for Tortious Interference

The Court next determines whether plaintiffs have stated a claim for tortious interference

with a prospective economic advantage under New Jersey law.  In their opposition brief, plaintiffs

assert that "Attwater's mischaracterization of the relationship between Attwater and the Plaintiffs

to The Right Thing [] constitutes the tortious interference and lends 'legitimacy' to the fact that

Hooper's statements to The Right Thing were false and made with malice."  (Pl. Br. 23-24.)

Reviewing those allegations outlined above, see discussion supra Part II.C and II.E.3, the

Court finds that plaintiffs have pled sufficient facts to show that they both had a reasonable

expectation of a prospective economic relationship with the possibility of securing employment with

The Right Thing and that defendants had knowledge of the expectancy of one.  See Printing Mart-

Morristown, 116 N.J. at 755 (New Jersey Supreme Court noting that the right protected is the

plaintiff's right to be free from "interferences with the prospect of obtaining employment or

employees. . . .").  Plaintiffs have alleged that they were in "pursuit" of business.  Id. at 751.

Plaintiffs also assert that defendants had knowledge of the prospective economic relationship in that

plaintiffs were having discussions with The Right Thing about potential employment opportunities.

(Am. Compl. ¶¶ 73, 83, 86, 96.)    Therefore, plaintiffs satisfy the first element.

Plaintiffs next must allege facts that defendants intentionally and with malice interfered with

plaintiffs' prospect of obtaining employment with The Right Thing.  For purposes of this intentional

tort, the New Jersey Supreme Court has explained that "'[t]he term malice is not used in the literal

sense requiring ill will toward the plaintiff.'"  Printing Mart-Morristown, 116 N.J. at 751 (quoting

Restatement (Second) of Torts Chapter 37 at 5 (introductory note)).  Instead, in this context, malice

is defined to mean "that the harm was inflicted intentionally and without justification or excuse."

Id. (internal citations omitted).

Plaintiffs assert that defendants mischaracterized the relationship between Attwater and plaintiffs to The Right Thing by improperly accusing plaintiffs of having breached their contracts with Attwater when they pursued job opportunities with The Right Thing. (Pl. Br. 23-24.) In support of their position, plaintiffs cite to two paragraphs in the Amended Complaint. The first paragraph alleges that, Terhark telephoned Hooper. During their conversation, Hooper "bashed" Zaccaria's reputation and advised Terhark to not further pursue Zaccaria presumably as a possible job candidate. (Am. Compl. ¶ 80.) The second paragraph alleges that Hooper told Knierim that he was legally obligated under his contract to advise Attwater of any communications between Knierim and any competitors of Attwater, including any contact from The Right Thing. (Am. Compl. ¶ 84.)

As to the first allegation, it pertains solely to Zaccaria, and thus Knierim cannot rely on this allegation in support of his tortious interference claim. (See Am. Compl. ¶ 80.) While attempting to besmirch another's reputation and advise a prospective employer to not hire a job candidate could possibly amount to intentional interference with prospective employment, Zaccaria fails to allege any sufficient specific facts beyond vague and conclusory statements attributable to Hooper.[8] Such an allegation is insufficient to satisfy the standard governing the "intentional interference with malice" element.[9]

---

[8] See also Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 109 (1988); Bainhauer v. Manoukian, 520 A.2d 1154, 1175 (N.J. App. Div. 1987).

[9] As set forth above, see discussion supra Part II.E.3, Hooper's alleged defamatory statements are either too vague or conclusory and/or amount to statements of opinion, and thus are not actionable. As such, not only do they not support plaintiffs' defamation claims, but they are insufficient to sustain plaintiffs' claims for tortious interference with prospective economic advantage. Moreover, plaintiffs cannot rely on Hooper's alleged statement that he "was going to speak with Tanya" to ensure that Quintegra would never rehire Knierim. First, plaintiffs do not

30

With respect to Knierim's legal obligations under the Knierim Contract, this allegation is silent as to whether Hooper conveyed any such statement to Terhark or any other representative of The Right Thing. Rather, plaintiffs allege that Hooper conveyed this information only to Knierim. Moreover, accepting as true plaintiffs' allegation, Hooper's statement does not show how he intentional interfered with Knierim's prospective employment with Terhark. Finally, in support of their claim, plaintiffs allege that "defendants intentionally, and with malice, divulged confidential information to third-parties." (Am. Compl. ¶ 125.) However, plaintiffs do not specifically allege what confidential information, if any, defendants revealed, and to whom. Accordingly, this vague allegation cannot support their tortious interference claims.

In short, a review of the Amended Complaint reveals that it is devoid of any specific allegations demonstrating that Hooper intentionally interfered with plaintiffs' prospective employment with The Right Thing. Therefore, defendants' motion to dismiss plaintiffs' tortious interference with prospective economic advantage claims against Attwater is granted.

## F.    Subject Matter Jurisdiction Over Plaintiffs' Contract Claims

Defendants move to dismiss plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing for failure to satisfy the $75,000.00 amount in controversy requirement for establishing diversity jurisdiction.[10] Defendants argue that Zaccaria alleges a loss of $11,450.00, while Knierim alleges a loss of $16,740.86, with respect to their

---

allege that Hooper actually spoke with Quintegra. Second, plaintiffs do not allege that either of them ever sought employment with Quintegra, such that Hooper allegedly tortious interfered with any prospective employment with that company.

[10] As this Court has already dismissed these claims against Raue and Hooper for lack of personal jurisdiction, the Court will limit its discussion to whether plaintiffs' contract claims should be dismissed for lack of subject matter jurisdiction only against Attwater.

contract claims.  As plaintiffs' defamation and tortious interference claims fail as a matter of law, defendants urge this Court to decline to exercise its supplemental jurisdiction over the contract claims, which fall woefully below the statutory $75,000 minimum, and dismiss the contract claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

As a threshold matter, under 28 U.S.C. § 1332, a district court has subject matter jurisdiction over state law claims if each of the plaintiffs is a citizen from a state different from each defendant and the amount in controversy exceeds $75,000.  See Werwinski v. Ford Motor Co., 286 F.3d 661, 666 (3d. Cir. 2002).  In the Amended Complaint, Zaccaria and Knierim each seek damages well in excess of $2,000,000.00 regarding their intentional tort claims.

This Court has already ruled that plaintiffs' intentional torts claims must be dismissed against Attwater for failure to state a claim and against Raue and Hooper for lack of personal jurisdiction. Although the amount in controversy is now $11,450.00 regarding Zaccaria's contract claims and $16,740.86 for Knierim's contract claims, this Court retains jurisdiction because diversity jurisdiction is determined at the time the complaint is filed.  Moreover, "if jurisdiction exists at the time the action is commenced, such jurisdiction may not be divested by subsequent events." Freeport-McMoRan, Inc. v. K N Energy, Inc., 498 U.S. 426, 428 (1991).  See State Farm Mutual Auto. Ins. Co. v. Powell, 87 F.3d 93, 97 (3d Cir. 1996) (noting that "subsequent events that reduce the amount in controversy below the statutory minimum do not require dismissal.");  see also Kane v. U-Haul Int'l, Inc., Civ. No. 01-6002 (RBK), 2005 WL 2621935 *2 (D.N.J. Oct. 14, 2005) (district court retaining jurisdiction over state law claims amounting to $14,500 in damages despite earlier dismissal of other claims satisfying amount in controversy requirement).  In Powell, the Third Circuit explained that a distinction exists between "subsequent events that change the amount in controversy

32

and subsequent *revelations* that, in fact, the required amount was or was not in controversy at the commencement of the action." 87 F.3d at 97 (quoting Jones v. Knox Exploration Corp., 2 F.3d 181, 182-83 (6th Cir. 1993)).

Defendants confuse "subsequent events" with "subsequent revelations."  In Powell, "subsequent revelations" arose when the parties discovered that, after the commencement of the lawsuit, one of the defendant's original three insurance policies was not in effect during the time of the plaintiff's automobile accident – thus the revelation that only two policies were at issue when the litigation began.  87 F.3d at 97.  Here, in contrast, the dismissal of plaintiffs' intentional tort claims falls within the meaning of "subsequent events."  See Powell, 87 F.3d at 97; Kane, 2005 WL 2621935 at *2.  In short, this Court rejects defendants' argument in favor of dismissal.  Accordingly, the Court denies defendants' motion to dismiss plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing for lack of subject matter jurisdiction under Fed. R. Civ. P. Rule 12(b)(1).

###        G.       Defendants' Motion To Dismiss Under Fed. R. Civ. P. 12(b)(3)

Defendants have moved to dismiss Knierim's contract claims for lack of venue pursuant to Fed. R. Civ. P. 12(b)(3) based on the forum selection clause contained in the Knierim Contract.[11] Specifically, defendants assert that the forum selection clause clearly states that "any and all actions must be brought in the state or federal court sitting in Cook County, Illinois," and thus, Cook County, Illinois is the proper and exclusive venue in which such contract claims should be brought.

---

[11] In their reply brief, defendant also move to dismiss plaintiffs' intentional tort claims because they arise out of plaintiffs' respective independent contractor agreements.  (Def. Reply Br. 18-19).  The Court need not address this argument because other grounds exist to dismiss the intentional tort claims.  See discussion supra Part II.C and E.

33

(Ben Raue Decl., Ex. A).   For the reasons set forth below, the Court declines to dismiss the remaining claims.   Rather, this Court, on its own motion, will transfer the claims to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a).

"In federal court, the effect to be given a contractual forum selection clause in diversity cases is determined by federal not state law." Jumara v. State Farm Ins. Co., 55 F.3d 873, 877 (3d Cir. 1995).  See Stewart Operation, Inc. v. Ricoh Corp., 487 U.S. 22, 32 (1988).  In the Third Circuit, the procedure for enforcing a forum selection clause is by motion to transfer venue under 28 U.S.C. §1404(a).  Salovaara v. Jackson Nat'l Life Ins. Co., 246 F.3d 289, 297-98 (3d Cir.2001).   In the alternative, a motion may be brought under Rule 12(b)(6) as dismissal under this Rule is another "permissible means of enforcing a forum selection clause that allows suit to be filed in another federal forum." Id. at 298; Crescent Int'l Inc. v. Avatar Communities, Inc., 857 F.2d 943, 944 (3d Cir.1988).  The Third Circuit has cautioned that "as a general matter, it makes better sense, when venue is proper but the parties have agreed upon a not-unreasonable forum selection clause that points to another federal venue, to transfer rather than dismiss." Salovaara, 246 F.3d at 299.

Here, the proper procedure for enforcement of the forum selection clause, which points to a choice of the federal and state courts sitting in Cook County, Illinois, is by motion to transfer venue pursuant to 28 U.S.C. § 1404(a).  See id. at 297-98.  Section 1404(a) permits a district court to transfer a case to any other district where venue is proper, such as here, "for the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. §1404(a).  The parties' execution of a contract containing a forum selection clause is a "significant factor that figures centrally into the district court's calculus." Stewart Org., 487 U.S. at 29.  Generally, the party seeking transfer bears the burden of establishing that transfer is necessary.  Jumara, 55 F.3d at 879.  However, when a

34

plaintiff freely enters into a contract for a specific venue, deference then should not be given to a

subsequent choice of a different forum. Id. at 880. Additionally, when the forum selection clause

is valid, the plaintiff has the burden of showing that the choice of forum should not be enforced. Id.

> In the Third Circuit, a forum selection clause is presumptively valid and will be enforced:

>> unless the party objecting to its enforcement establishes (1) that it is
>> the result of fraud or overreaching; (2) that enforcement would violate
>> strong public policy of the forum; or (3) that enforcement would in
>> the particular circumstances of the case result in jurisdiction so
>> seriously inconvenient as to be unreasonable.

MoneyGram Payment Sys., 65 Fed. Appx. at 846 (quoting Coastal Steel Corp. v. Tilghman

Wheelabrator, Ltd., 709 F.2d 190, 202 (3d Cir. 1983)). See also Wall Street Aubrey Golf, LLC v.

Aubrey, Civ. No. 05-5027, 2006 WL 1525515, at *2 (3d Cir. June 5, 2006) ("Forum selection

clauses are entitled to great weight, and are presumptively valid.").

> Even though the forum selection clause is presumptively valid, the Court still must consider

the competing private and public interests. See Jumara , 55 F.3d at 879-80 (after determining that

the jurisdiction and venue would be proper in the transferee district, the court, then, must consider

two broad categories of private and public interests). The first category includes considerations

relevant to the private interests of the litigants. Id. at 879. Important private interests are: (1)

"plaintiff's forum preference;" (2) "defendant's preference;" (3) "whether the claim arose

elsewhere;" (4) "the convenience of the parties as indicated by their relative physical and financial

condition;" (5) "the convenience of the witnesses – but only to the extend that the witnesses may

actually be unavailable for trial in one of the fora," and (6) "the location of books and records

(similarly limited to the extent that the files could not be produced in the alternative forum." Id.

(internal citations omitted).

The second broad category includes the public's interests in a fair and efficient administration of justice.  Jumara, 55 F.3d at 879-80.  Considerations here include: (1) "the enforceability of the judgment;" (2) "practical considerations that could make the trial easy, expeditious, or inexpensive;" (3) "the relative administrative difficulty in the two fora resulting from court congestion;" (4) "the local interest in deciding local controversies at home;" (5) "the public policies of the fora;" and (6) "the familiarity of the trial judge with the applicable state law in diversity cases."  Id. (internal citations omitted).

Neither list of factors is exhaustive.  Rather, the analysis under Section 1404(a) is flexible and individualized, based on the unique facts of each case.  Lawrence v. Xerox Corp., 56 F. Supp.2d 442, 449 (D.N.J. 1999).

1.    Private Interest Factors

As a general principle, a plaintiff's choice of forum is given great weight in an analysis under Section 1404(a).  See Lony v. E.I. DuPont de Nemours & Co., 886 F.2d 628, 633 (3d Cir. 1989).  First, plaintiffs chose to litigate in this Court and in this State where they both are citizens.  This factor weighs against a transfer.  Second, Attwater, a citizen of Illinois, would rather litigate in the Northern District of Illinois or in state court in Cook County, Illinois.[12]  Thus, this factor weighs in favor of transfer.

Third, the contract claims arose in Illinois, New Jersey, and Ohio (where The Right Thing

_____

[12] Defendants' Section 1404(a) analysis of the competing private and public factors is limited to their discussion concerning the transfer only of Zaccaria's contract claims because defendants argue that Knierim's contract claims should be dismissed for improper venue under Fed.R.Civ.P. 12(b)(3).  In their brief, defendants articulated reasons in favor of transferring Zaccaria's contract claims, which this Court finds are equally applicable to transferring Knierim's contract claims.  Accordingly, the Court will consider these arguments in evaluating whether Knierim's claims should be transferred under Section 1404(a).

is located).  Attwater, through Hooper, was not present in New Jersey at the time the company engaged in the alleged conduct, which includes terminating Knierim's job.  It is unclear from the allegations in the Amended Complaint in which state Knierim was located at the time he was fired. Indeed, approximately only 19% of the 215 "major jobs" that Knierim performed for Attwater from the period of November 2005 until August 2006, were performed in New Jersey.  (Knierim Decl. ¶ 13.)  Therefore, whether Knierim was working in New Jersey or another state at the time Attwater breached Knierim's contract is not clear from the Amended Complaint or the parties' submissions. Additionally, the Amended Complaint is silent as to where Knierim's contract was executed. Accordingly, this factor does not impact the decision to transfer.

Fourth, plaintiffs both reside in New Jersey.  Thus, it is more convenient for them to litigate in this Court.  However, Attwater is incorporated and has its principal place of business in Illinois. It is more convenient then for Attwater to litigate this case in Illinois.  The parties do not allege that any of them have inadequate resources to litigate this action in a distant forum.  Accordingly, this factor does not impact the Court's decision to transfer.

Fifth, Knierim does not claim that any witness may be unavailable for trial.  However, Attwater asserts that all of the witnesses, except for plaintiffs, will "likely" be available for trial in Illinois but not New Jersey.  Attwater offers that, as evidenced by the allegations in the Amended Complaint, most witnesses are employees or independent contractors of Attwater or SBT, both located in Illinois.  The convenience of witnesses should be considered "only to the extent that the witnesses may actually be unavailable for trial in one of the fora." Jumara, 55 F.3d at 879.  There is no evidence that any witnesses for either party would be totally unavailable to testify in either New Jersey or Illinois as opposed to merely being inconvenienced by the distance.  Accordingly, the

37

convenience of the parties and witnesses are neutral factors that do not weigh in other party's favor.[13] Sixth, the private factor regarding the location of the relevant documents and records does not clearly weigh in favor of either fora because neither party has suggested that the transportation of documents to either forum would be unduly burdensome or expensive.

### 2.     Public Interest Factors

Three of the public interest factors are not relevant. No evidence is before this Court suggesting that a judgment would be more enforceable in New Jersey or that a trial in this forum would be more efficient. In addition, there is no evidence that New Jersey or Illinois have any overriding local interests or public policies. However, as to the third factor on court congestion, defendants cite to the Federal District Court Management Statistics (2005) as evidence that there were fewer civil cases scheduled in the Northern District of Illinois than in this District. However, such statistics are from near three years ago, and so do not dispositively establish that this District is more congested today. As to the sixth factor, the Knierim Contract provides that it is governed by the laws of the state of Illinois, and thus Illinois' law will be applied to decide Knierim's contract claims. This factor then weighs in favor of transfer.

In opposition to transfer, plaintiffs argue that the case sounds primarily in tort, not contract. Plaintiffs' argument is without merit. In <u>Crescent Int'l Inc.</u>, the Third Circuit determined that the plaintiffs may not avoid forum selection clauses by "simply pleading non-contractual claims in cases involving the terms of a contract containing the parties' choice of forum." 857 F.2d at 945. The

---

[13] As an aside, the Court notes that key witnesses, if any, who reside in either Illinois, Ohio (location of The Right Thing), North Carolina (location of defendant Alladin), or Indiana (location of defendant Bollinger), but refuse to testify, would not be subject to the subpoena power of this Court. <u>See</u> Fed.R.Civ.P. 45(b)(2).

Court in <u>Crescent</u> reasoned that, "pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms." <u>Id.</u> A similar conclusion can be reached here.

Plaintiffs submit that Knierim was free (under his contract) to discuss prospective employment opportunities with The Right Thing – opportunities with which Hooper tortiously interfered by defaming Knierim's reputation. Accordingly, this Court concludes that Knierim's tort claims, at a minimum, implicate Knierim's contract terms. (<u>See</u> Pl. Br. 24; Am. Compl. ¶¶ 84-85.) In short, Knierim sets forth no compelling basis for his intentional tort claims to be read independently of the Knierim Contract with Attwater. Thus, this Court finds that the forum selection clause in the Knierim Contract should apply to all of his legal claims.

Balancing the various private and public interests pursuant to Section 1404(a), this Court finds that the alternative forum, the Northern District of Illinois, is not only adequate but would better serve the applicable private and public interests. Therefore, the Court will deny defendants' motion to dismiss based on improper venue. However, the Court will transfer Knierim's contract claims to the Northern District of Illinois, pursuant to 28 U.S.C. § 1404(a), and consistent with the terms of the freely bargained for contractual forum selection clause between Knierim and defendant Attwater.

## H.    Defendants' Motion To Transfer Zaccaria's Contract Claims

Alternatively, defendants argue that, to the extent any claims survive their motion to dismiss, such as Zaccaria's contract claims, they should be transferred to the Northern District of Illinois, pursuant to 28 U.S.C. § 1404(a). Zaccaria did not have a written independent contractor agreement with Attwater. Rather, plaintiffs argue that he had an enforceable oral contract. Accordingly, there

39

is no forum selection clause for the Court to enforce by granting defendants' motion to transfer venue under section 1404(a).  However, the Court has already determined that Knierim's contract claims should be transferred to the Northern District of Illinois to enforce the contractual forum selection clause and because the Northern District of Illinois, is not only an adequate forum, but would better serve the applicable private and public interests.

In light of these competing private and public interests and the Court's decision to transfer Knierim's contract claims, the Court grants defendants' motion to transfer Zaccaria's contract claims to the Northern District of Illinois under section 1404(a).[14]  Finally, as the Court will transfer plaintiffs' contract claims against Attwater to the Northern District of Illinois, pursuant to 28 U.S.C. § 1404(a), the Court declines to address defendants' alternative argument that plaintiffs' claim for breach of implied covenant of good faith and fair dealing be dismissed for failure to state a claim under Fed.R.Civ.P. 12(b)(6). (See Def. Moving Br. Point VI.)

## III.    CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted in part and denied in part, and the Court transfers venue of the remaining claims to the Northern District of Illinois.



                                                      s/ SUSAN D. WIGENTON
                                                      United States District Judge

---

[14] On December 21, 2006, defendants Siemens Building Technologies, Gina Alladin, and Michael Bolinger filed an Answer to the Amended Complaint and asserted cross-claims for indemnification and contribution against defendants Attwater, Hooper and Raue.  However, the answering defendants did not submit any opposition to the pending motion to dismiss and, thus, have waived any objections to the transfer of plaintiffs' contract claims against defendant Attwater to the Northern District of Illinois.  See 28 U.S.C. § 1404(a); Fed. R. Civ. P. 12(b).

40

cc:    Hon. Madeline Cox Arleo, U.S.M.J.
        Clerk of the Court
        Parties